FILED
06/25/2020
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 1, 2020

## IN RE SHYANNE H. ET AL.

**Appeal from the Juvenile Court for Williamson County**
**No. LF 37368          Sharon Guffee, Judge**

_____

**No. M2019-02127-COA-R3-PT**

_____

This is a termination of parental rights case brought by the Tennessee Department of Children's Services.  The juvenile court terminated the parental rights of the mother and the father on the grounds of persistence of conditions and severe child abuse, pursuant to Tennessee Code Annotated sections 36-1-113(g)(3) and 36-1-113(g)(4), respectively.  The juvenile court also terminated the father's parental rights on the additional ground of severe child abuse pursuant to Tennessee Code Annotated section 36-1-113(g)(5).  The Mother appealed the grounds for termination as well as the juvenile court's finding that termination was in the children's best interests, while the father only appealed the juvenile court's best interests finding.  Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and W. NEAL MCBRAYER, JJ., joined.

Jennifer L. Honeycutt, Franklin, Tennessee, for the appellant, Wayne H.

Emily G. Pfeiffer, Nashville, Tennessee, for the appellant Latasha H.

Herbert H. Slattery, III, Attorney General and Reporter; Jordan K. Crews, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I. BACKGROUND AND PROCEDURAL HISTORY

Latasha H. ("Mother") and Wayne H ("Father") were married in 2006, and,

together, they are the parents of the five children at issue in this case: S.H., born in October of 2003; J.H., born in June of 2006; W.H., born in October of 2008; C.H., born in December of 2009; and E.H., born in May of 2012 (together, "the Children").[1] The Department of Children's Services ("DCS") first became involved with Mother, Father, and the Children in December 2015 while the family was living in Davidson County, Tennessee. DCS responded to the family home based on a referral for environmental neglect and lack of supervision. The DCS investigator stated that the home was infested with roaches, that there were animal feces on the floor, and that there were dirty dishes and food on the stove and in the refrigerator. It was also determined that E.H. had obtained a loaded and unsecured handgun from inside the home and had shot himself in the arm. On December 10, 2015, DCS filed a petition for dependency and neglect in the Davidson County Juvenile Court. The Children were placed with their grandmother pursuant to an Immediate Protection Agreement ("IPA"); however, because the IPA "was not kept properly[,]" the Children were ultimately placed in state custody. On February 3, 2017, the Davidson County Juvenile Court found the Children dependent and neglected,[2] and it also found that Mother and Father had committed severe child abuse against all five of the Children.[3] Following successful trial home visits ordered by the Davidson County Juvenile Court, the Children were intermittently returned to the custody of Mother and Father: E.H. on September 30, 2017; S.H. and J.H. on October 6, 2017; C.H. on February 11, 2018; and W.H. on February 12, 2018. Mother and Father then relocated to Williamson County, Tennessee.

On April 20, 2018, about two months after Mother and Father had regained custody of all five of the Children, DCS received another referral alleging lack of supervision and physical abuse against E.H. and C.H. Specifically, the referral alleged that E.H. had a cut on his left ear and burn marks on the inside of his leg and that C.H. also had burn marks the size and shape of a cigarette on his finger. Sandra Grensberg, the Child Protective Services Investigator assigned to the case, interviewed E.H. and C.H. at school on April 23, 2018. Neither child, however, reported or disclosed abuse during these interviews. The next day, Ms. Grensberg interviewed E.H. and W.H. at school and C.H., J.H., and S.H. at the family home. E.H., W.H., and C.H. reported multiple and various forms of physical abuse from Father, that they were scared to be at home when DCS left, that Father threatened to beat them if they admitted anything to DCS, and that they planned on running away from home that night. Neither S.H. nor J.H. made any disclosures of abuse that day. That same day, due to the concerns for the Children's safety, DCS completed an IPA, whereby Father agreed to leave the home until the

---

[1] In cases involving minor children, it is this Court's policy to redact names of persons involved so as to protect the identities of the children.

[2] Initially, on August 1, 2016, the Davidson County Juvenile Court found all five of the Children to be dependent and neglected and severely abused, finding further that Mother and Father were perpetrators of the abuse. Mother and Father petitioned for a rehearing of this decision, which came to be heard on January 4, 2017.

[3] There is nothing in the record indicating that Mother or Father appealed this order.

investigation was complete. Additionally, Father was allowed only supervised visitation with the Children and was prohibited from visiting the Children overnight.

On May 2, 2018, DCS filed a dependency and neglect petition in the Williamson County Juvenile Court. In a preliminary hearing order entered on May 16, 2018, the Williamson County Juvenile Court ordered that Mother and Father would retain temporary legal custody of the Children, but that Father would have no overnight visits and that his visitation would be supervised by a third party other than Mother. The Williamson County Juvenile Court also ordered Mother and Father to complete a clinical assessment consisting of parenting and anger-management components.

Sometime in June 2018, Mother and the Children were evicted from the family home.[4] Following the eviction, Mother and the Children moved to Shelbyville, Tennessee to live with Kimberly Poteete—Father's sister—and her three children. Around the same time, Father also moved to Shelbyville and lived in an apartment two streets away from Ms. Poteete's home. On July 18, 2018, the Williamson County Juvenile Court ordered that its prior orders remain in effect—requiring Father's visits to be supervised, prohibiting Mother from supervising the visits, and prohibiting overnight visits in general. However, during an Individual Education Plan ("IEP") meeting at school on August 23, 2018, E.H., C.H., and W.H. each reported that the Children spent the night with Father at his apartment in Shelbyville on multiple occasions. Due to safety concerns, the Williamson County Juvenile Court then entered an *ex parte* protective custody order on September 4, 2018, placing all five of the Children in state custody. Abigail Jones, a case manager in the foster care division of DCS, was assigned to the case. Thereafter, on September 7, 2018, the Davidson County Juvenile Court entered a final order, granting jurisdiction of any and all pending matters regarding the Children to the Williamson County Juvenile Court (hereinafter, the "juvenile court").

On September 20, 2018, DCS developed a permanency plan, requiring Mother and Father, among other things, to: comply with the safety plans developed by the Child and Family Team; complete all additional recommended assessments, such as parenting education, victim-abuse counseling, and anger management; provide proof of legal and stable income; provide proof of safe and stable housing; participate in family counseling; and participate in supervised therapeutic visitation with the Children. The juvenile court ratified the permanency plan on October 24, 2018.[5] To assist Mother and Father in completing their tasks under the permanency plans, DCS, among other things, arranged

---

[4] Gregory Collins, the lead investigator for Williamson County DCS, testified that Mother had reported being evicted because the Children "were too loud."

[5] A second permanency plan was developed on November 16, 2018 and ratified by the juvenile court on January 8, 2019. The second plan was similar to the first, but the juvenile court added the following modifications: that family therapy between Mother and Father and any of the Children would begin only at the recommendation of the Children's therapists and the parents' therapists; and that the Children were *not* required to participate in weekly phone calls with Mother and Father.

family support services, including domestic-violence education and anger management, provided therapeutic visitation for the family, completed home studies, and arranged and scheduled the parents' clinical assessments.

The juvenile court further limited the Children's contact with Mother and Father due to the chaotic nature of the family visitations. During a sibling visit at which Mother and Father were also present, Mobile Crisis was called for C.H., and, ultimately, he had to be hospitalized at Vanderbilt Psychiatric Hospital in order to stabilize his psychological condition. Around the same time, E.H.'s therapist recommended that he refrain from sibling visits because he was "struggling to cope with the chaos of the[] visits." In a February 6, 2019 judicial review order, the juvenile court prohibited E.H. from participating in sibling visitation pending further court orders, limited sibling visitations to consist of only two of the Children at a time, and prohibited Mother and Father from attending sibling visitations.

The juvenile court restricted Mother's and Father's contact with the Children even further following a review hearing on March 5, 2019. In the review order, filed on March 14, 2019, the juvenile court noted the current circumstances of the Children, all of whom had been placed in separate foster homes: S.H. was participating in individual counseling, was doing well, and had expressed that she did not want to have contact with Mother or Father; J.H. was receiving therapy through Omni Visions but had recently began displaying disruptive and noncompliant behaviors; W.H. was participating in weekly therapy and was "making great progress"; C.H. had been placed in the Youth Villages campus in Bartlett, Tennessee following his release from Vanderbilt Psychiatric Hospital; and E.H. was receiving therapy services but had begun to exhibit disobedient and aggressive behaviors following a phone call with Mother and Father. Considering the foregoing, the juvenile court found that visitation with Mother and Father was causing "substantial harm" to the Children and that it was in the Children's best interests to suspend visitation with the parents.

After entering state custody on September 4, 2018, the Children made multiple, additional disclosures of abuse against Mother and Father. In case recordings dated February and March 2019, S.H. reported to Ms. Jones, her guardian ad litem Katy Miller, and her Court Appointed Special Advocate Pam Godwin, that, after Father was required to leave the family home pursuant to the IPA, she and Mother got into a fight in which Mother shoved her, held her by the neck against the kitchen counter, and hit her in the face with a frying pan. S.H. also reported that, while Mother and the Children were living with Ms. Poteete during the summer of 2018, Mother accused her of trying to "steal her husband" and ruin the parents' relationship.[6] Additionally, S.H. reported that both Mother and Father had choked her and hit her in the face. E.H. reported incidents of

---

[6] Equally disturbing are S.H.'s reports of Mother's emotional abuse. S.H. suffers from alopecia, and, according to S.H., Mother would "rub in her face that she had hair[.]"

- 4 -

abuse to Jennifer Broadrick, his therapist from January to May 2019 and whom he would see three to four times a week. He reported that Father had choked him and held him against the wall on multiple occasions and that, on one occasion, Father had whipped his face with a belt. E.H. compared Father to the Hulk because "the Hulk destroys everything." While W.H. and C.H. made numerous disclosures of abuse to Ms. Grensberg in April 2018 when the investigation was initiated and prior to entering state custody, they did not make specific disclosures of abuse to Ms. Jones; however, both W.H. and C.H. told Ms. Jones that they would not be able to go home if they ever told her what happened at home.

On May 13, 2019, DCS filed a petition in the juvenile court to terminate the parental rights of Mother and Father to all five of the Children, alleging the following grounds: persistence of conditions pursuant to Tennessee Code Annotated section 36-1-113(g)(3); severe child abuse pursuant to Tennessee Code Annotated sections 36-1-113(g)(4) and 36-1-113(g)(5); and failure to manifest an ability and willingness to assume custody of the Children pursuant to Tennessee Code Annotated section 36-1-113(g)(14). In early June 2019, S.H. started to become nervous about the upcoming termination trial at which she planned to testify. Ms. Godwin visited her at her foster home and reported that S.H. was burdened with the emotional weight of possibly "tear[ing] up her family." A week later, S.H. ran away from her foster home, and she was still on "runaway status" at the time of trial.

The juvenile court conducted a trial on the petition on July 19 and 24, 2019, September 6 and 19, 2019, and October 8, 2019. In an order filed on November 18, 2019, the juvenile court terminated Mother's and Father's parental rights on the grounds of persistence of conditions and severe child abuse, and it terminated Father's rights on the additional ground of having received a sentence of more than two years' imprisonment for severe child abuse against E.H.[7] Additionally, the juvenile court found that termination of Mother's and Father's parental rights was in the best interests of the Children. Father and Mother timely filed notices of appeal on December 3, and December 6, 2019, respectively.

## II. ISSUES PRESENTED

Mother raises three issues for review on appeal, restated as follows:

1. Whether the juvenile court erred in terminating Mother's parental rights on the ground of persistence of conditions.
2. Whether the juvenile court erred in terminating Mother's parental rights on the ground of new allegations of severe child abuse.

---

[7] DCS elected not to pursue the ground of failure to manifest an ability and willingness to assume custody of the Children.

3. Whether the juvenile court erred in finding that termination of Mother's parental rights was in the best interests of the Children.

Father does not challenge the juvenile court's findings regarding the grounds for termination of his parental rights. Rather, Father raises only one issue for review on appeal: whether the juvenile court erred in finding that termination of his parental rights was in the best interests of the Children.

## III. STANDARD OF REVIEW

Under both the United States and Tennessee Constitutions, a parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (Tenn. 1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only when a compelling interest exists. *Nash-Putnam*, 921 S.W.2d at 174-75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of a parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769. Accordingly, both the grounds for termination and that termination of parental rights is in the child's best interests must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id.*

In view of the heightened standard of proof in termination of parental rights cases, a reviewing court must modify the customary standard of review in Tennessee Rule of Appellate Procedure 13(d). As to the trial court's findings of fact, our review is de novo with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Jones v. Garrett*, 92 S.W.3d 835, 838

(Tenn. 2002).

## IV. GROUNDS FOR TERMINATION OF PARENTAL RIGHTS

As noted earlier, the juvenile court terminated Mother's and Father's parental rights on the grounds of persistence of conditions and severe child abuse, and it terminated Father's rights on the additional ground of having received a sentence of more than two years' imprisonment for severe child abuse against E.H. Although only one ground must be proven by clear and convincing evidence in order to terminate a parent's rights, the Tennessee Supreme Court has instructed this Court to review every ground relied upon by the trial court to terminate parental rights in order to prevent "unnecessary remands of cases." *In re Angela E.*, 303 S.W.3d 240, 251 n.14 (Tenn. 2010). Moreover, the Tennessee Supreme Court has also instructed this Court to "review a trial court's findings regarding all grounds for termination and whether termination is in a child's best interests, even if a parent fails to challenge these findings on appeal." *In re Carrington H.*, 483 S.W.3d 507, 511 (Tenn. 2016). Accordingly, we will review each of the foregoing grounds on which the trial court relied in terminating Mother's and Father's parental rights.

### A. Persistence of Conditions

The juvenile court relied on Tennessee Code Annotated section 36-1-113(g)(3) as a ground for terminating Mother's and Father's parental rights, which provides as follows:

> (A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;
> (B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

Tenn. Code Ann. § 36-1-113(g)(3).[8]  In the instant action, the Davidson County Juvenile Court adjudicated the Children dependent and neglected and victims of severe child abuse on February 3, 2017.  Additionally, following Mother's and Father's noncompliance with numerous court orders, the Children were placed in state custody on September 4, 2018 pursuant to the *ex parte* protective custody order.

When the instant case's referral to DCS was made in April 2018, the family had 22 prior child protective services referrals, 8 of which were investigated.  However, despite being, as the juvenile court noted, "well versed in the ways of DCS[,]" Mother and Father failed to show—with their words and actions—that the Children could ever be safely returned to their custody.  Specifically, the juvenile court found as follows:

> The parents were hostile and demanding, especially Father.  They never accepted responsibility for their behavior or the children's behavior.  Unlike the first custodial episode, they blamed everything on DCS.  Father was so confrontational, the court had to order his communication be in writing because he was constantly harassing every department in DCS.  While they completed the tasks on the permanency plan, they never implemented anything they were taught after the DCS caseworker explained to them, it's "quality, not quantity."  The providers had a difficult time working with Father and making recommendations to him.  He dominated the meeting and intimidated everyone.  Even throughout the days of trial in this case, the parents sat glaring at everyone, arms crossed over their chests.

These facts—most significantly Mother's and Father's refusal to acknowledge the severe child abuse pervading throughout this custodial episode—indicate that the conditions that led to the Children's removal still persist and that there is little likelihood such conditions will be remedied in the near future.  *See In re L.M.H.*, No. E2017-00604-COA-R3-PT, 2017 WL 4331037, at *6 (Tenn. Ct. Ap. Sept. 28, 2017) (affirming the trial court's termination of a father's parental rights on the ground of persistence of conditions due to his "fail[ure] to take responsibility for his actions leading to the removal of the children" and "refus[al] to acknowledge the harm that he has caused the children."); *see also In re Dakota C.R.*, 404 S.W.3d 484, 501 (Tenn. Ct. App. 2012) ("In light of their continued refusal to take responsibility for the children's injuries, as well as their continued belief that they have done nothing wrong, it is unlikely that Mother or Father will change their behavior to prevent such abuse in the future.").  Further, we have previously held that a parent who has refused to acknowledge that the other parent has committed abuse will be unlikely to protect the children from such abuse in the future.  *See In re H.L.F.*, 297 S.W.3d 223, 232 (Tenn. Ct. App. 2009).  Accordingly, we conclude, that the evidence is

---

[8] DCS filed the termination petition on May 13, 2019.  Accordingly, all versions of the statutes referenced herein are those that were effective on that date.

clear and convincing in favor of the juvenile court's finding that Mother's and Father's parental rights should be terminated on the ground of persistence of conditions within the meaning of Tennessee Code Annotated section 36-1-113(g)(4).

### B. Severe Child Abuse

The juvenile court also relied on Tennessee Code Annotated section 36-1-113(g)(4) as a ground for terminating Mother's and Father's parental rights. This statutory ground provides that a parent's rights may be terminated if that parent (1) "has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court" or (2) "is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]" Tenn. Code Ann. § 36-1-113(g)(4). Here, the juvenile court terminated Mother's and Father's parental rights on both bases provided in Tennessee Code Annotated section 36-1-113(g)(4). We will address each in turn.

First, the juvenile court terminated Mother's and Father's parental rights based upon a prior finding of severe child abuse. On February 3, 2017, the Davidson County Juvenile Court found that Mother and Father had committed severe child abuse against all five of the Children based upon the fact that E.H. had found a loaded and unsecured handgun in the family home and had shot himself in the arm.[9] Moreover, as noted previously, neither parent appealed this order. As this Court has stated, "[o]nce there has been a finding of severe child abuse in a final order, the doctrine of res judicata prevents parents from re-litigating the issue of whether they committed severe child abuse in a subsequent proceeding to terminate their parental rights."[10] *In re C.D.*, No. M2016-00275-COA-R3-PT, 2016 WL 4548042, at *5 (Tenn. Ct. App. Aug. 30, 2016). Further, this Court "has repeatedly applied the doctrine of res judicata to prevent a parent from re-litigating whether he or she committed severed child abuse in a termination of parental rights proceeding when such a finding has already been made in a previous dependency and neglect action." *In re Kylea K.*, No. E2017-02097-COA-R3-PT, 2018 WL 3084530, at *4 (Tenn. Ct. App. June 21, 2018). Because Mother, Father, and DCS were parties in the prior dependency and neglect action, and because the issue of whether Mother and

---

[9] Quoting the Davidson County Juvenile Court's February 3, 2017 Order of Adjudication, the Williamson County Juvenile Court, in its Termination of Parental Rights Order, stated: "The fact that [E.H.] found the handgun and suffered serious bodily injury constitutes severe child abuse, and the parents knowingly failed to protect their children from the same danger, thus making all of the children severely abused."

[10] Under the doctrine of *res judicata*, "'an existing final judgment rendered upon the merits, without fraud or collusion, by a court of competent jurisdiction, is conclusive of the rights, questions and facts in issue as to the parties and their privies, in all other actions in the same or any other judicial tribunal of concurrent jurisdiction.'" *In re Heaven L.F.*, 311 S.W.3d 435, 439 (Tenn. Ct. App. 2010) (quoting *Galbreath v. Harris*, 811 S.W.2d 88, 90 (Tenn. Ct. App. 1990)).

Father committed severe child abuse was fully litigated, the issue of whether Mother and Father committed severe child abuse is res judicata.

Second, the juvenile court also terminated Mother's and Father's parental rights based upon new allegations of—and ultimate findings that the parents had committed—severe child abuse under subsections (A) and (B) of Tennessee Code Annotated section 37-1-102(b)(27).

Subsection (A) defines severe child abuse as "[t]he knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death[.]" Tenn. Code Ann. § 37-1-102(b)(27)(A)(i). Here, the Children's disclosures of abuse are both consistent and shocking, revealing a violent and chaotic home in which the Children were subjected to constant abuse by both Mother and Father. The juvenile court even noted that, "[i]f ever there was a case of severe abuse, this is it." The following includes only some of the Children's disclosures of abuse committed by Father: throwing a DVD case at W.H.'s head; throwing a boot at E.H.'s head and busting his nose; punching W.H. in the chest; beating and slapping the Children in the face; making J.H. sit on his knees and punching him in the chest; hitting S.H. so hard that she went unconscious; hitting J.H. in the head with a wooden plank and splitting his head open; hitting W.H. so hard that he stopped breathing and an ambulance had to be called; choking E.H. and holding him against a wall on multiple occasions; whipping E.H. in the face with a belt; and spanking S.H. until she bled. Mother's abuse was directed more towards S.H., the daughter: in one instance, Mother held S.H. by the neck against the kitchen counter and hit her in the face with a frying pan; in another, Mother spat on S.H. and hit her in the face, busting S.H.'s nose and giving her a black eye. Mother's abuse of S.H. was also emotional: S.H. suffers from alopecia, and, according to S.H., Mother would "rub in her face that she had hair[.]"[11] The foregoing clearly constitutes "the knowing use of force on a child that is likely to cause serious bodily injury or death." Tenn. Code Ann. § 37-1-102(b)(27)(A)(i).

Subsection (B) defines severe child abuse as follows:

---

[11] Mother argues on appeal that S.H. recanted her prior disclosures of abuse in a voicemail to Mother's attorney shortly before the trial began and in a YouTube video that was posted as the trial was ongoing. The juvenile court, however, did not lend credibility to S.H.'s recantations, noting that "the pressure on her to hold the family together was enormous" and that "[t]he YouTube video clearly appeared to be coached." Dr. Trey Monroe, a clinical psychologist testified as follows regarding S.H.'s recantations:

[In] the forensic interview, she was fluid and spontaneous. In the video, the YouTube, she was reading – she read a prepared statement and she mispronounced some of the words. I don't think she knew what she was exactly – knew what they meant. A couple of times, in the YouTube video, it looked like she looked off camera for – to make sure she was saying the right thing or reading the right thing.

Specific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or intellectual disability, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct[.]

Tenn. Code Ann. § 37-1-102(b)(27)(B). Here, Dr. Trey Monroe, a licensed clinical psychologist, completed psychological harm assessments for C.H. and E.H. Ultimately, Dr. Monroe determined that C.H. and E.H. exhibited numerous mental health disorders, including post-traumatic stress disorder, reactive attachment disorder, and generalized anxiety disorder. Specifically, Dr. Monroe noted that C.H.'s responses to the Complete These Sentences test "were obsessed with being bullied" and demonstrated "poor boundaries and primitive emotional functioning." For example, when prompted, "I will never forget," C.H. responded, "when you be mean to me." When prompted, "It is so important to me to," he responded, "love my family." These responses, according to Dr. Monroe, indicate that C.H. "is strongly bound to the abusive system." Dr. Monroe noted that E.H.'s responses to the Complete These Sentences test "explicitly mentioned how the domestic violence affects him emotionally" and mentioned an incident "where [Father] held him by his throat against a wall." Dr. Monroe opined that additional contact with Mother and Father would further harm C.H.'s and E.H.'s mental health. Clearly, the abuse endured by E.H. and C.H. "has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or intellectual disability, or severe impairment of the child's ability to function adequately in the child's environment[.]" Tenn. Code Ann. § 37-1-102(b)(27)(B).

Based on the foregoing, we conclude that the evidence is clear and convincing in favor of the juvenile court's finding that Mother and Father committed severe child abuse within the meaning of Tennessee Code Annotated section 36-1-113(g)(4).

### C. Sentence for Child Abuse

The juvenile court also relied on Tennessee Code Annotated section 36-1-113(g)(5) as a ground for terminating Father's parental rights, which provides, in relevant part, that a parent's rights may be terminated when the parent

has been sentenced to more than two (2) years' imprisonment for conduct against the child who is the subject of the petition . . . that has been found under any prior order of a court or that is found by the court hearing the petition to be severe child abuse, as defined in § 37-1-102.

Tenn. Code Ann. § 36-1-113(g)(5). The evidence in the record on appeal shows that, on September 7, 2016, Father pled guilty to attempted aggravated child neglect and received

a suspended sentence of 10 years imprisonment. The incident underlying Father's conviction—E.H.'s obtaining a loaded and unsecured handgun and shooting himself in the arm—was found by the Davidson County Juvenile Court to constitute severe child abuse pursuant to Tennessee Code Annotated section 37-1-102. The fact that Father did not serve any jail time does not preclude termination of his parental rights on this ground. The statute provides that, unless otherwise stated, "'sentenced' shall *not* be construed to mean that the parent or guardian must have actually served more than two (2) years confinement, but shall only be construed to mean that the court had imposed a sentence of two (2) or more years upon the parent or guardian[.]" Tenn. Code Ann. § 36-1-113(g)(5) (emphasis added); *see also In re K.G.*, W2003-00809-COA-R3-PT, 2004 WL 1073928, at *3-4 (Tenn. Ct. App. May 10, 2004) (affirming this ground where the mother received a four-year suspended sentence for two felony counts of child abuse and neglect). Accordingly, we conclude that the evidence is clear and convincing in favor of the juvenile court's finding that Father's parental rights should be terminated pursuant to Tennessee Code Annotated section 36-1-113(g)(5).

## V. BEST INTERESTS

Having found at least one statutory ground on which to sustain termination of Mother's and Father's parental rights, we must now consider whether DCS has proven by clear and convincing evidence that termination of Mother's and Father's parental rights is in the Children's best interests. *See* Tenn. Code Ann. § 36-1-113(c)(2). Once the court has determined that a parent is unfit based on clear and convincing evidence that one or more of the grounds for termination exists, the interests of the parent and child diverge, and the interests of the child become the court's paramount consideration. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005). If the interests of the parent and the child conflict, the court must always resolve the conflict in favor of the rights and best interests of the child. Tenn. Code Ann. § 36-1-101(d). Tennessee Code Annotated section 36-1-113(i) sets forth the following list of factors to be considered when determining a child's best interests in a termination of parental rights case:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to

- 12 -

have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). Because long-term foster care is disfavored, "many of the statutory best interest factors relate to the likelihood that the child will be able to leave foster care and return to the parent's home in the near future." *In re Adoption of J.A.K.*, No. M2005-02206-COA-R3-PT, 2006 WL 211807, at *4 (Tenn. Ct. App. Jan. 26, 2006). If that likelihood is remote, "the best interest of the child often lies in termination of parental rights so that the child can attain the security and stability of a permanent home through adoption." *Id.*

Here, the juvenile court found by clear and convincing evidence that it was in the best interest of the Children to terminate Mother's and Father's parental rights. In their respective appellate briefs, Mother and Father addressed the majority of the nine factors, arguing that the juvenile court erred in its determination that termination of their parental rights was in the Children's best interests. For example, regarding the first, second, and third best interest factors, Mother and Father argue that they were never afforded an opportunity to demonstrate their progress towards reunification with the Children because DCS severely limited their visitation and interaction with the Children. As noted throughout this opinion, however, the hallmark of this case is the severe child abuse committed by both parents. With regard to the permanency plans and services offered by DCS, Ms. Jones testified that Mother and Father "were more so concerned . . . of checking off boxes and completing tasks and not actually demonstrating the skills necessary to appropriately parent."[12] Moreover, the record reflects that the parents'

---

[12] When asked by the juvenile court why Mother and Father exhibited little to no progress, Ms. Jones responded: "I believe that the issue is a lack of wanting to change and to necessarily just put on a face in order to say we've done the job and in order to move on."

visitation was limited because of the damaging effect it had on the Children.[13]  As such, the limitations placed on Mother's and Father's visitation were appropriate.  Further, the parents' own conduct—most significantly their refusal to acknowledge their abuse and its harmful effects on the Children, both physically and psychologically—prevented them from being afforded the opportunity to demonstrate their progress.

With regard to the fourth best interest factor, Mother and Father argue that they both have a strong bond with the Children, and that the juvenile court erred in weighing this factor against them.  Specifically, the juvenile court found as follows:

> There is a relationship between the parents and the children.  As noted above, it is a powerful and controlling relationship laced with trauma and abuse.  It is not a meaningful, healthy relationship in any way.  In fact, most of the children's behavior is dramatically improving now that they are in healthy, safe environments and not visiting with parents.

Mother and Father do have a bond or relationship with the Children; however, the relevant inquiry is not whether the parents have any bond or relationship with the Children, but whether they have a *meaningful* bond or relationship with them.  We agree with the juvenile court that Mother's and Father's relationships with the Children are anything but meaningful, and, rather, are ones marred by abuse, control, and manipulation.  We conclude that the juvenile court appropriately weighed this factor against Mother and Father and in favor of termination.

Lastly, a change of caretakers and physical environment would have a negative effect on the Children's emotional, psychological, and medical well-being.  While the Children have encountered some setbacks throughout this custodial episode, such is to be expected considering the trauma they have experienced.  Moreover, the Children have been making improvements in their respective placements.  For example, W.H. had been "pretty stable" throughout the custodial episode, but his behaviors began to escalate around the time of trial—notably following his most recent contact with Mother and Father.  However, the juvenile court noted during the September 2019 permanency hearing—which occurred on the fourth day of trial—that W.H.'s behavior had improved dramatically.  After being discharged from Vanderbilt Psychiatric Hospital, C.H. was placed at Youth Villages in Bartlett, Tennessee, where he has been doing well, so much so that his therapist described his progress as "remarkable."[14]  E.H. has been receiving

---

[13] As noted above, during a sibling visit during which Mother and Father were present, Mobile Crisis had to be called for C.H., and he had to be hospitalized at Vanderbilt Psychiatric Hospital to stabilize his psychological condition.  Additionally, E.H.'s therapist recommended that he refrain from sibling visits because he was "struggling to cope with the chaos of the[] visits."

[14] In fact, Karmen Davis, the DCS Team Coordinator who supervised the case, testified as follows regarding C.H.'s current condition:

therapeutic services in his current foster home, and he has been making "significant progress" in trauma therapy. Additionally, E.H. has been doing well in school, and his foster parents are willing to adopt him.[15] While S.H. was still on "runaway status" at the time of trial, she had been making progress in her foster home. Moreover, S.H. had previously expressed a desire to stay with her foster family, who had expressed an interest in adopting her.[16] Out of all of the Children, J.H. had shown the least improvement. The evidence reflects, however, that contact with Mother and Father only hinders J.H.'s progress.[17]

There are many concerns in this case, but at the forefront is Mother's and Father's severe abuse of the Children. The record is replete with evidence pertaining to this problem, as well as Mother's and Father's refusal to acknowledge it. Again, the essential inquiry here is what is in the best interests of the Children, and based on this record, the Children's interests are served by terminating Mother's and Father's parental rights and remaining in their current respective placements, where they have the best opportunity to progress and achieve stability. In light of the foregoing, we conclude that the record contains clear and convincing evidence in favor of the juvenile court's finding that terminating Mother's and Father's parental rights is in the Children's best interests.

### CONCLUSION

For the foregoing reasons, the judgment of the trial court is hereby affirmed.

 

_____
ARNOLD B. GOLDIN, JUDGE

---

To see [C.H.] – you'll see – you know, he – he is doing a lot better. You know, this is not the same child that use to – you know, prior to going there. You know, he was very chaotic. He had a lot of anger and things like that when he first arrived there – a lot of physical restraints; issues with his peers; issues with staff – but now he doesn't have a lot of those issues anymore. [C.H.] can communicate about any issues that he's having and things like that.

[15] Ms. Davis stressed that E.H. was finally stable: "Very stable. I mean, stable at home, stable at school. Everyone who has known [E.H.] in the past and seen him now, they say, you know, a lot – he is a lot more stable, you know, a lot – doing a lot better."

[16] In fact, with regard to her foster family, S.H. had reported to Ms. Godwin that "it was the first time she felt like she had a family."

[17] For example, Ms. Davis testified that, after the juvenile court suspended phone calls between J.H. and the parents, J.H.'s therapist recommended resuming phone calls as a type of reward fore good behavior. Following his phone calls with Mother and Father, however, J.H.'s behavior only worsened and, according to Ms. Davis, "[did] not help[] in the situation at all."